**FORT WORTH & D. C. RY. CO. v. DILLEHAY.   (No. 11799.)**

Court of Civil Appeals of Texas. Fort Worth. May 14, 1927.

Rehearing Denied June 25, 1927.

1. Carriers ⬉213—Carrier required to deliver live stock with reasonable dispatch is not insuror as to time for completion of carriage.

Under bill of lading requiring carrier to transport and deliver live stock with reasonable dispatch and requiring shipper to load and unload stock at own risk, carrier is not insurer as to time within which carriage will be completed, in absence of special agreement.

2. Carriers ⬉230(8)—Requested special charges submitting to jury whether carrier's delay in delivering cattle was caused by necessity of unloading other cattle should have been given.

In action by shipper against carrier for damages for delay in delivering cattle, requested special charge submitting to jury whether when cattle arrived at destination other cattle had arrived in large numbers necessitating delay and preventing plaintiff's cattle from being unloaded in time to be sold on day of shipment, and whether carrier exercised ordinary care in delivering cattle with proper dispatch under such circumstances, should have been given.

3. Carriers ⬉230(3)—Under evidence showing congestion at unloading point, whether carrier's delay in delivering cattle was due to want of ordinary care held for jury.

In shipper's action against carrier for delay in delivery of live stock, jury should have been permitted to determine whether delay was due to want of exercise of ordinary care and diligence by carrier under evidence showing congested condition at unloading point necessitating delay.

4. Carriers ⬉215(1)—Railroad delivering cattle as soon as reasonable care permitted held not liable for loss from shipper's inability to sell on date of arrival.

Railroad delivering cattle to destination as soon as it could have been done in exercise of

reasonable care and diligence is not liable for resulting loss in weight, depreciation in appearance, or other inability, if any, of shipper to sell cattle on date of arrival.

5. Carriers ⬉228(4)—Evidence that other cattle unloaded subsequent to plaintiff's were sold on same day held erroneously excluded in action for loss from delay.

In shipper's action against carrier for damages resulting from delay in delivering cattle by reason of decline in market, evidence showing that other cattle were unloaded later than plaintiff's cattle and sold on same day was relevant and should have been admitted on issue whether plaintiff in exercise of ordinary care could have sold cattle and avoided loss occasioned by decline in market next day.

Appeal from District Court, Wise County; F. O. McKinsey, Judge.

Suit by R. H. Dillehay against the Fort Worth & Denver City Railway Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Thompson & Barwise, of Fort Worth, and McMurray & Gettys, of Decatur, for appellant.

M. W. Burch, Davenport & Brown, and H. E. Lobdell, all of Decatur, for appellee.

CONNER, C. J. This suit was brought in the district court of Wise county against the appellant, Fort Worth & Denver City Railway Company, seeking damages for delay in the shipment of six cars of cattle moving from Decatur to Fort Worth on the 18th day of September, 1923. Appellee, R. H. Dillehay, owned one car of mixed cattle, H. L. Donaldson owned one car mixed, Henry Bonden owned one car of mixed, B. M. Shoemaker owned one car calves, L. Renshaw owned one car beef steers, and J. A. Renshaw had three cars beef steers shipped at the time but complains of only one. Each of the six shippers made separate shipments, but all the cattle moved on the same train, and it was alleged that each of the other shippers assigned to plaintiff his claim for damages against appellant. It was alleged that the cattle were delayed in transit so that several hours more time than usual was consumed in making such trip, and that by reason thereof such cattle became stale in appearance, shrunken in weight, depreciated in value, and that the market declined before they could be sold, etc., by reason of which damages were claimed amounting to $1,890.77.

Appellant answered by general and special exceptions, general denial, and alleged specially that the shippers had the cattle destined to be placed in the stockyards and pens of the Fort Worth Stockyards Company, which company handled all the unloading of such cattle into its pens; that about the time of the arrival of the cattle in question at

---

⬉For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

North Fort Worth there arrived there over various other railroads many other cars of such cattle to be unloaded into the pens of and to be handled by said Forth Worth Stockyards Company; that so many of such cattle arrived over other railway trains seeking entrance into said stockyards that a congested condition was created, and it was impossible for said Stockyards Company to unload such cattle without such delay, though handling them in the usual and proper order and manner; that such shippers had designated such Stockyards Company to receive and unload and handle their said cattle, and the shipping contracts provided that such shippers should load and unload such cattle and such Stockyards Company was thus acting for such shippers in so handling such cattle; that appellant, as carrier, did not and could not know when receiving the cattle for shipment that such congested condition would arise at Fort Worth upon their arrival there, especially since such other shipments causing such congestion came in over other and independant railway lines.

The cause was tried on June 7, 1926, and submitted to a jury on special issues in which the jury were asked to find whether the cattle were transported and delivered at the unloading docks of the Fort Worth Stockyards Company "with usual and ordinary speed and dispatch." On the findings of the jury to the effect that the cattle were not so transported and delivered to the docks for unloading with the usual and ordinary speed and in the usual and ordinary time, together with a decline of market, depreciation in weight and value, the court entered judgment for plaintiff for $857.95, from which judgment an appeal has been duly prosecuted by defendant below.

The issues submitted by the court and determined by the jury, in so far as we think necessary to state, were: (1) Whether the cattle in question were "transported with usual and ordinary speed and dispatch to and delivered for unloading in the usual and ordinary time for such shipments at the unloading docks or chutes of the Fort Worth stockyards, where such delivery was made." (2) Whether said cattle were delivered at the stockyards in time to have been unloaded and sold on the market at that place on the day they were shipped. (3) If issue No. 1 was decided in the negative and it was found that "there was a failure to transport and deliver said cattle at the unloading docks with the usual and ordinary speed and dispatch and in the usual and ordinary time for such shipments," did said failure "to transport and deliver said cattle with usual and ordinary dispatch and in the usual and ordinary time for such shipments, if any such failure there was, prevent the sale of said cattle on said market on the day they arrived at the stockyards?" (4) Whether there was a deprecia-

tion of market price on the market of the Fort Worth stockyards for the class of cattle in question on the day following the shipment in controversy as compared with such market price on the day said cattle were delivered. (5) If you have answered issue No. 1 in the negative and have found that there was a failure to "transport the cattle in question with usual and ordinary dispatch and deliver them in the usual and ordinary time for such shipments," then at the time said cattle were sold on said market were they depreciated in weight by reason of and as a direct result of said failure to transport and deliver same with usual and ordinary dispatch, and in the usual and ordinary time for such shipments. (6) If you have answered issue No. 1 in the negative, and have found that there was a failure to "transport the cattle in question with usual and ordinary dispatch and deliver same at the Fort Worth stockyards for unloading in the usual and ordinary time for such shipments," then did such failure, if any there was, cause said cattle to have a stale or unsalable appearance at the time they were on the said market and cause them by reason thereof to sell for less on the market than they would have brought but for such appearance?

It is thus made apparent that by the court's charge the basic issue of the case as presented was whether the cattle were transported and delivered "with the usual and ordinary speed and dispatch." The several paragraphs of the charge in which the issues were so presented were objected to on behalf of appellant, on the ground that as presented the issues "erroneously permits the jury to estimate and assess all such loss in weight and depreciation in the market value as resulted after the lapse of the usual time for transportation and delivering such cattle, regardless of any negligence, and regardless of the condition shown by the evidence rendering it necessary to take more than the usual time in making delivery of the cattle to the docks on the occasion in question."

In the effort to correct the alleged deficiency in the issues submitted, the defendant requested the submission of several special issues, which were refused. One was whether, when the cattle in question arrived at Fort Worth, other cattle had just arrived in such numbers that to spot the cars for unloading in regular and proper order, when handled with ordinary care, necessitated such delay as prevented the cattle in question from being placed and unloaded in time to have been sold on the day of shipment; another was "whether the defendant, its servants and agents exercised ordinary care to transport and deliver the cattle in question with proper diligence and dispatch, under the circumstances existing at the time in question."

The evidence shows that the cattle in question moved out of Decatur at 6:35 a. m. and

arrived at North Fort Worth at 8:25 a. m. of the same day, and were set out on the receiving track of the Belt Line Railway at 8:35 a. m., which the testimony shows to have been a good run. There were 17 cars of cattle in the train, and R. J. Lockett, superintendent of the Fort Worth Belt Railway Company, and who personally supervised the handling and placing of the cars to the stockyards' chutes for unloading on the morning in question, testified, in substance, that the cattle were delivered by the defendant company to the Belt Line Railway Company at 8:35, and that the Belt moved the cars over to the dock about one hour after that, at 9:55 or 10 o'clock; that part of the cars were spotted at the unloading chute at 9:55 a. m., and part of them were not spotted until after 11 a. m. on account of other stock being unloaded; that the difference in time of spotting the cars was because there were more cattle on hand than could be placed at the dock. The witness further testified:

"We had stock from about four or five railroads that morning, some 70 or 80 cars; these cars there that morning were over the Frisco, Fort Worth & Denver, Cotton Belt, Santa Fé and Texas & Pacific roads. We could place at those chutes at a time on an average about 19 or 20 cars. * * * For native cattle at that time there were no other chutes or unloading docks available. * * * The Stockyards Company unloaded these cattle when I spotted them. The time it took the Stockyards Company to unload a shift of these cars that were set in there, say 18 or 19 cars, varies some. Of course the average time is around 45 minutes to an hour. * * * They unload them faster at one part of the day than another. From about 6 o'clock in the morning, I will say, up until 9 o'clock, the stockyards can get away with the cattle pretty fast, for the reason that they have the entire force there and they are not blocking the alleys with packers and commission men and scales, and like that; and at 9 o'clock, that is, when the packers begin to drive in cattle to the packeries, packing houses, and takes more or less time to get the cattle from the chutes to the commission firms. to those alleys, and that slows up the movement of the cattle.

"Q. That number of cars, coming in as close together as they did, does that or not cause a congestion of stock? A. At that time of the morning it does slow up the unloading, after 9 o'clock. It did on this date. If we could have had three hours before 9 o'clock we could have used all of the time. In other words, the stockyards would have gotten away with the cattle in better shape, therefore giving a chance of spotting the dock more often. We spotted those cars within the usual time, considering that many cars and that time of day. * * * At that particular time it is a little unusual for four or five railroads to dump in 70 or 80 cars, four or five different railroads, and that causes congestion at the dock, when they are all to be unloaded at one dock, necessarily causes a congestion at the dock. * * * It took them longer to unload cars than it took us to spot them. We could make a change on

the dock in 10 or 15 minutes, where it would take them about an hour from one load to another. * * * The Belt Company does not own unloading facilities, such as chutes, gangplanks, and things like that, that the cattle walk down on. They are owned entirely by the Stockyards Company. Speaking of the 70 or 80 cars, we had that run from four or five different railroads within a period of one hour. That is, the waybills were delivered to us within an hour. That means the cattle got there within an hour's time. * * * I had an order determining which cars we would place to the dock for unloading. We got the cattle moved to the docks in the manner in which received with the exception of a case of that kind—I mean in the order in which they are received, with the exception of where we have notice of some particular shipment where the 28 or 36 hour law is required. I mean where the law requires them to be unloaded within the time I mention. I followed that order and custom in unloading the cattle that morning, or spotting them for unloading that morning, as I have stated.

"Q. I believe it was shown yesterday that part of the Fort Worth & Denver shipment was spotted for unloading some time before the rest of those cars were unloaded, and you stated that the other cars were not spotted until after 11 o'clock on account of other cars being unloaded? A. Yes, sir; that was done in line with the explanation I have made, the conditions. The 18 cars from the T. & P. were included, of course, in the 70 or 80 cars that were to be handled from about 9 o'clock in the morning up until after 11. I mean by the explanation there that the five Denver cars were not spotted until after 11 o'clock in the morning on account of other cars being unloaded. Well, the other cars being unloaded were put there in the manner which they received them, which included the 18 cars received from the T. & P. Those were cattle that had precedence, according to our rules, over the five cars for spotting. They were spotted ahead of the five cars because they had precedence from the point of arrival, from crowding the 28 or 36 hour law; and those cattle that were crowding that law had come in over the T. & P., arrived in Fort Worth previous to 8 o'clock. It was 8 o'clock when I got notice. The way I remember that so well is, we were deprived of that engine for about one hour. We spotted the 5 cars in proper order. We got them to the dock just as soon as possible to do so, after the stockyards had unloaded the other cars."

The testimony in behalf of appellee undoubtedly tended to show that the cattle were not delivered to the Stockyards Company in the usual and customary time as submitted in the court's issues, and that in consequence thereof there was a depreciation in weight and appearance, and that the market price for cattle was lower on the 19th than on the preceding day, and the form in which the court submitted the issue seems to indicate that the trial court was under the impression that the duty of appellant to transport and deliver the cattle at the unloading dock within the usual and customary time was ab-

solute, regardless of circumstances causing delay not preventable by an exercise of due care. The bill of lading, under which the cattle in question were shipped, contained the following provision: "No carrier is bound to transport said live stock by any particular train or vessel or in time for any particular market, or otherwise than with reasonable dispatch;" and, also, "The shipper at his own risk and expense shall load and unload the live stock into and out of cars except in those instances where this duty is made obligatory upon the carrier by statute or is assumed by lawful tariff provision."

[1] While a carrier may by express agreement stipulate for a delivery within a specified time, it appears from the quotation made from the bill of lading that no such agreement was made in the present case. On the contrary, the agreement was to the effect that the transportation and delivery was to be with reasonable dispatch, and, in the absence of a special agreement, the carrier is not an insurer as to the time within which the carriage will be completed. See Trout & Newberry v. G. C. & S. F. Ry. Co. (Tex. Civ. App.) 111 S. W. 220; Fort Worth & D. C. Ry. Co. v. Lemons (Tex. Civ. App.) 258 S. W. 1095; Maloney v. Railway Co., 207 Ky. 262, 268 S. W. 1103, to the effect that:

"In the absence of a special contract fixing the time within which a carrier must deliver a live stock shipment, it is liable only for damages proximately caused by delay due to its negligence."

See, also, Kemendo v. Fruit Dispatch Co., 61 Tex. Civ. App. 631, 131 S. W. 74.

In 10 Corpus Juris, pp. 283, 284, it is said:

"A carrier is not an insurer against delay in the transportation of goods. * * * As to the diligence and care required in completing the express or implied contract for transportation only, the rule is that the carrier is bound to use reasonable diligence and care, and that only negligence will render it liable, unless a stipulated time is fixed in the contract."

In Hutchinson on Carriers, § 328, it is said:

What is a reasonable time must be determined by the length of the journey, the mode of conveyance, the weather, the state of the roads, the season of the year, the nature of the goods, the amount of business, if from any cause there should be an unusual temporary influx of freight, and any other circumstances which may properly be taken in consideration by a jury in finding whether the carrier has been guilty of unnecessary and improper delay; for the question must always be one of fact."

One of the causes of delay, as alleged by defendant, and of which there was evidence tending to show, was the necessity to unload ahead of those in question the 18 cars of cattle received from the Texas & Pacific Railway Company, which were nearing the limit of the federal 36-hour law and thus entitled to preference as perishable. In Peet v. Railway Co., 20 Wis. 594, 91 Am. Dec. 446, it is held:

"There is no invariable rule that freight of all kinds shall be transported and delivered in the order in which it is received, without regard to its character and condition, or its liability to perish. Perishable property may legally be given preference over other freights, where there is a press of freights and consequent delay. It is a reasonable practice."

[2-4] In G. H. & S. A. Ry. Co. v. Buck (Tex. Civ. App.) 230 S. W. 891, and Railway Co. v. Neville (Tex. Civ. App.) 272 S. W. 597, it is held in effect that where there is unusual delay and there is any question under the evidence as to whether it is reasonable or unreasonable it should be left to the jury to determine. We are of the opinion that if it be assumed that the court's charge was correct as far as it went, and that it did not unduly emphasize by repetition the apparent view of the court, nevertheless we think the special charges requested by the defendant, as indicated, should have been given. Under the evidence, we think the jury should have been permitted to determine whether the delay in question was due to a want of an exercise of ordinary care and diligence. If in fact the defendant company delivered the cattle to the Fort Worth Stockyards Company as soon as it could have been done in the exercise of reasonable care and diligence, it was not liable for the resulting loss in weight, depreciation in appearance, if any, or for the inability, if any, of the plaintiff to sell on the market of the 18th, and we think, under decisions too numerous to mention, that the defendant had the right to have its defense presented affirmatively to the jury.

[5] On the trial the defendant offered the testimony of W. H. Abernathy and J. B. Crenshaw tending to show that cattle other than those in controversy were unloaded as late as 12:30 and 1:05 p. m. and sold on the market of the 18th. This testimony was tendered on the issue of whether the plaintiff in the exercise of ordinary care and prudence could have sold the cattle in question on the market of the 18th, and thus have avoided the losses occasioned by the decline in the market of the next day. This evidence was excluded on the ground, as shown by the bill of exception, that the cattle as unloaded and sold were not handled in the same manner as those of plaintiff, or arrived at the same time, or received the same or similar treatment, and was immaterial and irrelevant. An inability to sell the cattle in question on the market of the 18th because of the delay alleged was specifically charged in the plaintiff's petition, and the decline in the market was made one of the grounds upon which a recovery of damages was sought, and we

think the evidence tendered and rejected was relevant and proper for the jury's consideration on that issue.

We conclude that the court erred in the particulars suggested, and that the judgment must be reversed and the cause remanded.